**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                )
PACIFIC MARITIME ASSOCIATION                    )
                                                )
                                                )
                                                )        Case No. 1:12-cv-01477-BAH
                    Plaintiff,                   )        Judge Beryl A. Howell
                                                )
                                                )
        v.                                      )
                                                )
                                                )
NATIONAL LABOR RELATIONS BOARD                  )
                                                )
                                                )
                                                )
                    Defendant.                   )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

MORGAN, LEWIS & BOCKIUS LLP
Howard M. Radzely (D.C. Bar #437957)
Charles I. Cohen (D.C. Bar #284893)
David R. Broderdorf (D.C. Bar #984847)
1111 Pennsylvania Avenue, NW
Washington, D.C.  20004
(202) 739-5996

Counsel for PACIFIC MARITIME
ASSOCIATION

Table of Contents

Page

I.      Introduction ............................................................................................. 1

II.     Factual Background ................................................................................. 2

        A.      Overview Of PMA, ILWU And Collective Bargaining For The West
                Coast Ports ................................................................................... 2

                1.      The Pacific Maritime Association ("PMA") ............................... 2

                2.      The International Longshore And Warehouse Union ("ILWU") &
                        Its Collective Bargaining Agreements With PMA ...................... 3

                3.      The West Coast Ports .................................................................. 3

                4.      PMA Member Companies ........................................................... 4

        B.      Brief History Of ILWU Bargaining Relationship With PMA Over
                Maintenance and Repair Work ..................................................... 5

        C.      The Port Of Portland Privatizes Certain Functions To ICTSI Oregon, Inc.,
                But Keeps Others For Its Public Employees Represented By The IBEW,
                Local 48 ...................................................................................... 7

        D.      ICTSI's Admission To PMA ......................................................... 8

        E.      ICTSI's Use Of The ILWU Employees Under The PCLCD ................. 9

        F.      The NLRB Section 10(k) Proceeding ............................................ 9

                1.      The Section 8(b)(4)(D) Charge Filed By ICTSI .......................... 11

                2.      The 10(k) Hearing ..................................................................... 11

                3.      The NLRB's Regional Director Denies PMA's Motion To
                        Intervene .................................................................................. 12

                4.      The PMA Files A Request For Permission To Appeal To The
                        Board ....................................................................................... 12

                5.      The Board's August 13, 2012 10(k) Decision ........................... 13

                6.      PMA's Motion For Reconsideration ........................................... 14

        G.      Proceedings By The Board Against The ILWU .............................. 15

III.    ARGUMENT ........................................................................................ 15

        A.      Summary Judgment Standard ..................................................... 15

        B.      The NLRB Lacked Authority To Issue A Section 10(k) Decision Because
                There Were Not Two Competing Groups Of Statutory "Employees" ......... 16

                1.      The Express Text Of Section 8(b)(4)(D) And Section 10(k)
                        Provide The NLRB Jurisdiction Only Where Two Groups of
                        NLRA-Covered Employees Seek The Same Work ......................... 16

Table of Contents
(continued)

Page

2.   The Legislative History Of Section 8(b)(4)(D) And Section 10(k)
     Supports The Plain Language Interpretation As Well ............................ 19

3.   NLRB Precedent Also Supports The Plain Language Of Section
     8(b)(4)(D) ............................................................................................. 21

4.   Nothing In The Board's August 13 Decision Saves The Board's
     *Ultra Vires* Action ............................................................................... 24

C.   *Leedom v. Kyne* Provides This Court Jurisdiction To Reverse The Board's
     *Ultra Vires* Action .................................................................................... 26

     1.   Violation Of Clear Statutory Mandate In Section 8(b)(4)(D) ................. 29

     2.   PMA Has No Other Means Within Its Control To Have This *Ultra
          Vires* Agency Action Reviewed ............................................................ 30

IV.  Conclusion .................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................ 15

*Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) ..........................................................................................27

*BedRoc Ltd. v. United States*,
541 U.S. 176 (2004) .................................................................................. 16, 19

*Butler v. DOJ*,
492 F.3d 440 (D.C. Cir. 2007) ...................................................................... 16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................................................ 15

*Children's Hosp. of Mich.*,
299 NLRB 430 (1990) .................................................................................... 18

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992) ........................................................................................ 16

*Dist. No. 15, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*,
326 NLRB 62 (1998) ...................................................................................... 10

*Hale v. Port of Portland*,
308 Or. 508, 783 P.2d 506 (1989) ................................................................ 18

*Int'l Longhore & Warehouse Union Local 13*,
208 NLRB 995 (1974) ...................................................................................... 5

*Int'l Longshore &Warehousemen's Union Local 10 (Howard Terminal)*,
147 NLRB 359 (1964) ...................................................................................... 5

*Int'l Longshoremen & Warehouse Union & Pac. Maritime Ass'n. v. ICTSI Oregon, Inc.*,
Case No. 3:12-cv-01058-SI (filed June 13, 2012) ...................................... 14

*Int'l Longshoremen Ass'n, Local 1911 (Cargo Handlers)*,
236 NLRB 1439 (1978) .................................................................................. 25

*Int'l Longshoremen's & Warehousemen's Union, Local 14, AFL-CIO v. NLRB*,
85 F.3d 646 (D.C. Cir. 1996) ........................................................................ 22

*Int'l Longshoremen's & Warehousemen's Union, Local 62-B v. NLRB*,
781 F.2d 919 (D.C. Cir. 1986) ("Alaska Timber") .................................... 17, 19, 26

*Int'l Longshoremen's & Warehousemen's Union Local
   No. 19 (Albin Stevedore Co.)*, 144 NLRB 1443 (1963) ........................................5

*Int'l Longshoremen's & Warehousemen's Union v. NLRB*,
   884 F.2d 1407 (D.C. Cir. 1989) ("Sea-Land") ...............................................15, 26

*International Brotherhood of Electrical Workers, Local 48*,
   358 NLRB No. 102 (Aug. 13, 2012) ("the August 13 Decision") ...................passim

*Kay v. Fed. Commc'ns Comm'n*,
   525 F.3d 1277 (D.C. Cir. 2008)........................................................................19

*Leedom v. Kyne*,
   358 U.S. 184 (1958) ...............................................................................passim

*Local 236, International Brotherhood of Teamsters*,
   194 NLRB 594 (1971) ...............................................................................21, 22

*Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO*,
   219 NLRB 528 (1975) .....................................................................................22

*Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO*,
   244 NLRB 357 (1979).................................................................................22, 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ........................................................................................15

*McCulloch v. Sociedad Nacional de Marineros de Honduras*,
   372 U.S. 10 (1963) ("Honduras")...............................................................27, 28

*Metro. Stevedore Co. v. Rambo*,
   515 U.S. 291 (1995) ........................................................................................16

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*,
   437 F.3d 1256 (D.C. Cir. 2006)......................................................................27

*NLRB v. Plasters' Local Union No. 79*,
   404 U.S. 116 (1971) ........................................................................................17

*NLRB v. Radio & Television Broad. Eng'rs Union, Local 121*,
   364 U.S. 573 (1961) ("CBS")........................................................................9, 17

*Pac. Maritime Ass'n*,
   256 NLRB 769 (1981)........................................................................................5

*Plumbers Local 195 (Gulf Oil)*,
   275 NLRB 484 (1985)......................................................................................25

ii

*Rwy. Labor Executives' Ass'n v. Nat'l Mediation Bd.*,
  29 F.3d 655 (D.C. Cir. 1994) ("RLEA") ........................................................27, 29

*Shipowners' Ass'n of the Pac. Coast*,
  7 NLRB 1002 (1938) .......................................................................................4

*Sturm, Ruger & Co. v. Chao*,
  300 F.3d 867 (D.C. Cir. 2002)........................................................................27

*Tao v. Freeh*,
  27 F.3d 365 (D.C. Cir. 1994)..........................................................................15

*United States v. Bombardier Corp.*,
  380 F.3d 488 (D.C. Cir. 2004).........................................................................19

*United States v. Pac. Maritime Ass'n*,
  229 F. Supp. 2d 1008 (N.D. Cal. 2002)..........................................................3, 4

*Wolverine Power Co. v. FERC*,
  963 F.2d 446 (D.C. Cir. 1992).........................................................................19

## Statutes & Rules

Fed. R. Civ. P. 56(a) .........................................................................................15

29 U.S.C. §§ 141 *et seq.*, 61 Stat. 136 (Labor Management Relations Act of 1947)............3, 9, 20

29 U.S.C. § 152(2) ............................................................................................18

29 U.S.C. § 152(3)..............................................................................13, 14, 18

29 U.S.C. § 158(b)(4)(D) ...........................................................................passim

29 U.S.C. § 159(b)(1) .......................................................................................26

29 U.S.C. § 160(e) and (f) ................................................................................26

29 U.S.C. § 160(k) .......................................................................................1, 10

Or. Rev. Stat. §§ 778.010, 174.116(2)(hh), 198.605 .......................................18

Or. Rev. Stat. §§ 292.055 and 243.776.............................................................8

## Other Authorities

*http://www.portofportland.com/PDFPOP/Newsroom_Corporate_Fact_Sheet.pdf* ...................18

Jared S. Gross, *Yet Another Reappraisal of the Taft-Hartley Act Emergency Injunctions*, 7
  U. Pa. J. Lab. & Emp. L. 305, 311 (2005)................................................................3

S. 1126, 80th Cong., 1st Session .............................................................................20

S. 249, Hearings Jan. 31, Feb. 1, 2, 3, 1949 .........................................................21

Cong. Record, Senate, June 6, 1947 ......................................................................20

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
## OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Pacific Maritime Association ("PMA"), by and through undersigned counsel, submits this memorandum in support of Plaintiff's Motion for Summary Judgment.

### I.    Introduction

This case concerns an action by the National Labor Relations Board ("NLRB" or the "Board") taken in Washington, D.C.  Plaintiff respectfully requests this Court direct the NLRB to comply with its governing statute and to set aside and enjoin the NLRB from relying on its decision in *International Brotherhood of Electrical Workers, Local 48*, 358 NLRB No. 102 (Aug. 13, 2012) ("the August 13 Decision").  This *ultra vires* decision was purportedly issued pursuant to 29 U.S.C. §§ 158(b)(4)(D) and 160(k) to resolve a jurisdictional dispute between a group of public-sector employees and a group of private-sector employees.  However, the NLRB was plainly without jurisdiction to adjudicate the matter, as one of the two employee groups vying for the work at issue was composed of public-sector employees – employees expressly *excluded* from coverage under the National Labor Relations Act ("NLRA" or the "Act").

Not only did the Board wrongly deny PMA's motion to intervene in the Board's proceedings, but the Board also failed to provide any explanation for expanding its jurisdictional reach to a group of employees excluded from the NLRA by Congress.  This *ultra vires* action by the Board has placed PMA in an untenable position with respect to its member companies and the International Longshore and Warehouse Union ("ILWU"), and, if left unchecked, threatens to destabilize the Coast-wide collective-bargaining relationship and disrupt the operations at the Ports on the West Coast.

Given that the Board's actions are clearly contrary to the NLRA, PMA expects the Board to challenge this Court's authority to hear this dispute because Section 10(k) decisions are not

considered "final orders" in NLRA parlance, and are thus ordinarily not subject to "review" by the federal courts until the Board makes an unfair labor practice determination in a later case. However, PMA's instant challenge falls squarely within a limited exception to jurisdiction fashioned in the Supreme Court's decision in *Leedom v. Kyne* and its progeny, which provides that federal district courts have jurisdiction to stop agency action in excess of its statutory authority where the plaintiff has no other effective means within its control to challenge the agency. This case is precisely that situation. Thus, PMA respectfully requests that this Court grant PMA's motion for summary judgment, declare the Board's decision null and void, and take other appropriate action.

## II.    Factual Background[1]

### A.    Overview Of PMA, ILWU And Collective Bargaining For The West Coast Ports

#### 1.    The Pacific Maritime Association ("PMA")

PMA is a membership organization consisting of approximately 70 stevedoring companies, terminal operators, maintenance and repair contractors, and shipping lines (also referred to as carriers) serving every significant port on the West Coast of the United States. SMF at ¶ 1. Every major stevedore, terminal operator, maintenance and repair contractors, and shipping line serving the West Coast is a member of PMA. *Id.*

---

[1] Upon review of this Court's local rules, Plaintiff is unclear whether a Statement of Material Facts is required under LCvR 7(h)(1), or whether the 7(h)(2) exception applies. Even though it appears that this action falls under the 7(h)(2) exception, as the basic issue before the Court involves an administrative agency's decision, out of an abundance of caution PMA has accompanied its Motion for Summary Judgment with a Statement of Material Facts. These Material Facts, along with the background information in this Section, are largely taken from the Section 10(k) proceedings and the August 13 Decision. In addition, PMA has provided this factual summary, in sufficient detail, for the Court to generally familiarize itself with the background for the August 13 Decision. However, these facts are undisputed and need not be analyzed by the Court to rule on the narrow legal questions presented by PMA's Complaint; namely: (i) whether the Board can issue a 10(k) decision where one group of employees are public-sector employees who fall outside the Board's jurisdiction and (ii) whether there is jurisdiction under *Leedom v. Kyne.*

2.     The International Longshore And Warehouse Union ("ILWU") & Its
       Collective Bargaining Agreements With PMA

The ILWU represents longshoremen and marine clerks working in all major ports on the

West Coast of the United States.  SMF at ¶ 2.  The ILWU (on behalf of itself and its longshore

and marine clerk locals) and PMA (on behalf of itself and its member companies) have been

parties to a series of coastwise collective bargaining agreements called the Pacific Coast

Longshore and Clerks' Agreement ("PCL&CA") consisting of two contract documents – the

Pacific Coast Longshore Contract Document ("PCLCD") covering longshoremen and the Pacific

Coast Clerks' Contract Document ("PCCCD") covering marine clerks.  *Id.*  Currently, there are

approximately 14,000 registered longshoremen and marine clerks and approximately 14,000

casual workers eligible for employment by PMA member companies working under the

PCL&CA.  Declaration of Todd C. Amidon ("Amidon Dec."), Ex. A.

3.     The West Coast Ports

Smooth functioning of the West Coast ports is critical to the United States economy.  For

example, PMA member companies employing ILWU labor under the PCL&CA handled and

transported "just over 15 million loaded container TEUs (twenty-foot equivalent units)" through

West Coast ports in 2011, "[w]ith cargo ranging from tennis shoes and personal computers to

heavy equipment and produce."  Amidon Dec., Ex. A.

Indeed, the efficient movement of cargo through the West Coast ports is so important to

our nation that in 2002 the United States obtained a Taft-Hartley injunction to prohibit both

lockouts and strikes in connection with a labor dispute between the PMA and ILWU.  *United*

*States v. Pac. Maritime Ass'n*, 229 F. Supp. 2d 1008 (N.D. Cal. 2002).[2]  In granting a Taft-

---

[2] The Taft-Hartley injunction procedure is codified in Sections 206-210 of the Labor Management Relations Act, 29
U.S.C. §§ 176-180.  It is a multi-step procedure that must be initiated by the President of the United States.
Ultimately, if the procedure is properly invoked, a federal court may issue an injunction against an actual or

3

Hartley injunction for the first time in over a quarter of a century, the court explained that, the "West Coast ports are crucial gateways to America's trade routes to Asia and the Pacific. Indeed, the affected ports annually handle over 50 percent of the nation's containerized imports and exports, with a total annual value of bulk cargo at $300 billion." *Id.* at 1009. (citation omitted). The court also noted, among many other potential adverse effects, that the labor dispute also threatened to "disrupt[] the transport of essential military cargo and jeopardize[] one of the Department of Defense's core missions - equipping and sustaining the military at a time when it is prosecuting a global war on terrorism." *Id.* at 1013. (citation omitted).

4.    PMA Member Companies

PMA has an internal process by which member companies participate in the industry's decision-making over matters of contract bargaining and labor relations with the ILWU. Amidon Dec., Ex. J (Tr. 359:23-362:14 [Marzano]). PMA speaks with one voice on labor relations matters and the interests of a particular member may have to give way for the benefit of the industry as whole. *Id.* at (Tr. 210:2-20 [Mullen]; Tr. 362:15-25, 422:11-18 [Marzano]). Whether a particular member agrees with a particular decision or not, that member is still bound. *Id.* at (Tr. 368:6-10 [Marzano]). PMA's right to resolve matters for the benefit of the industry as a whole and the members' corresponding duty to comply with those decisions derive from PMA's charter, its internal governing bodies, and is inherent in the integrity of the system of multi-employer bargaining. *Id.* at (Tr. 367:25-368:5). This bargaining structure has become a part of the nation's labor policy and has helped to foster relative stability in the maritime industry

---

threatened work stoppage for up to 80 days. A President has invoked this procedure 35 times since the Taft-Hartley Act was enacted in 1947, but the 2002 injunction was the first successful invocation since 1971. *See* Jared S. Gross, *Yet Another Reappraisal of the Taft-Hartley Act Emergency Injunctions*, 7 U. Pa. J. Lab. & Emp. L. 305, 311 (2005).

in the decades since the strikes of the 1930s.  *See generally Shipowners' Ass'n of the Pac. Coast*, 7 NLRB 1002, 1041 (1938).

      B.      Brief History Of ILWU Bargaining Relationship With PMA Over Maintenance And Repair Work

      Even before the ILWU was certified as collective bargaining agent of longshoremen on the West Coast in 1938, ILWU longshoremen performed the equipment maintenance and repair ("M&R") of cargo-handling equipment.  Amidon Dec., Ex. J (Tr. 629:15-630:6 [Sundet]).  In 1978, the ILWU and PMA established a specific type of longshoreman, called a longshore mechanic, whose primary duties consist of M&R work.  *Id.* at (Tr. 582:16-18 [Sundet]).  The parties included specific language setting forth ILWU's jurisdiction over M&R in the PCLCD.  *Id.* at (Tr. 589:15-24 [Sundet]).  Sections 1.7 and 1.71 of the PCLCD require PMA-member companies to assign to the ILWU "the maintenance and repair of ***containers of any kind*** and of chassis, and the movement incidental to such maintenance and repair" and "the maintenance and repair of ***all stevedore cargo handling equipment***."  Amidon Dec., Ex. B (emphases added); *see also, e.g.*, *Pac. Maritime Ass'n*, 256 NLRB 769, 769 (1981) (addressing Sections 1.7 and 1.71).

      Over the decades, technology has modified longshore work and made M&R an increasingly important component.  The ILWU and PMA have reached historic accords to allow the employers to take advantage of technological innovation and, at the same time, to allow the union to preserve and protect its jurisdiction over the cargo-handling operations as those operations evolve.  Amidon Dec., Ex. J (Tr. 589:15-24 [Sundet]).  *See, e.g.*, *Int'l Longshoremen's & Warehousemen's Union Local No. 19 (Albin Stevedore Co.)*, 144 NLRB 1443, 1448 (1963); *Int'l Longshore &Warehousemen's Union Local 10 (Howard Terminal)*, 147 NLRB 359, 360-61 (1964); *Int'l Longshore & Warehouse Union Local 13*, 208 NLRB 995, 995-97 (1974).

In coastwise contract negotiations in 2008, the parties agreed to a new such accord. Amidon Dec., Ex. J (Tr. 589:15-24 [Sundet]). The parties had long understood that, as a general rule, M&R of containers, chassis and cargo handling equipment had to be assigned to the ILWU. *Id.* at (Tr. 369:4-15 [Marzano]; Tr. 589:15-17, 589:24-590:8 [Sundet]). In exchange for the ILWU agreeing to cooperate with PMA's members introducing new technologies, the parties agreed to clarify the ILWU's right to perform M&R work by making express which facilities and which work were excluded from the general rule that M&R had to be assigned to the ILWU. *Id.* Specific facilities or types of M&R work at those facilities where the member-employer had a CBA with another union were "red circled," meaning that the member-employer could continue to assign the work to that workforce at that facility rather than to the ILWU. Amidon Dec., ¶ 10, Ex. C. PMA reaffirmed that at all other facilities the M&R had to be assigned to the ILWU. Amidon Dec., Ex. J at (Tr. 589:15-17 [Sundet]).

To ensure that PMA-member employers could not use Section 10(k) of the NLRA to nullify these contractual commitments to the ILWU over jurisdiction, the parties also added a provision requiring PMA and its member companies to defend the ILWU's jurisdiction in legal proceedings. Amidon Dec., ¶ 11, Ex. D. Section 1.76 of the Agreement provides that:

> The Employers shall assign work in accordance with Section 1 provisions and as may be directed by the CLRC [Coast Labor Relations Committee] or an arbitration award, which the Employers shall defend in any legal proceeding. PMA shall participate along with the individual Employers assigning the work in any legal proceeding.

This provision was negotiated with Section 10(k) specifically in mind to require PMA-member employers to, among other things, express a "preference" for the ILWU when the dispute concerns work that the employers agreed to assign to the ILWU. Amidon Dec., Ex. J (Tr. 375:6-24, 376:5-10 [Marzano]); Tr. 655:3-6, 721:7-9, 729:9-15 [Sundet]).

6

C.     The Port Of Portland Privatizes Certain Functions To ICTSI Oregon, Inc., But
       Keeps Others For Its Public Employees Represented By The IBEW, Local 48

Unlike many other ports on the West Coast, the Port of Portland has historically been operated by a public entity.  In 2006, the Port of Portland began to take steps to privatize the operation of Terminal 6.  SMF at ¶ 3.  The Port solicited information and proposals from private terminal operators interested in operating Terminal 6 under a long-term lease.  *Id.* ILWU representatives met with the Port to discuss the Port's actions and, specifically, the ILWU's claim to the plugging/unplugging and monitoring of refrigerated containers ("reefers") on dock at Terminal 6 under the PCLCD.  *Id.*

On May 12, 2010, the Port Commission approved a 25-year lease to ICTSI Oregon, Inc. ("ICTSI"), a multi-national terminal management company without prior experience on the West Coast.  SMF at ¶ 4.  The Port thereby relinquished control of terminal operations, leased or sold its cargo handling equipment to ICTSI (with the exception of the stationary cranes), signed over all of its steamship line contracts to ICTSI, and became a landlord.  SMF at ¶ 5.  ICTSI, not the Port, became answerable to the shipping lines for maintaining the reefers and the shippers' products inside.  *Id.*

At the same time the Port transferred terminal management responsibilities to ICTSI, the lease agreement between the Port and ICTSI contained crucial exceptions to that arrangement whereby certain work, including M&R work on reefers, would be retained by the Port and performed by the Port's employees.  SMF at ¶ 4.  The Port-ICTSI lease contains the following clauses that keep certain work with the Port's employees:

> **Section 2.8** For so long as the DCTU ["District Council of Trade Unions"] Agreement remains in effect with respect to the Terminal, the Lessee shall not (i) perform, or except as permitted hereunder, cause to be performed, at the Terminal any DCTU Work or (ii) undertake any other action that would cause the Port to be in

> violation of the terms of the DCTU Agreement. The Lessee shall
> be responsible for any claims, including any labor claims, that arise
> from the Lessee's failure to comply with this Section 2.8.
>
> . . . .
>
> **Section 3.23 (a)** The Port shall ... make available to the Lessee
> [ICTSI] the DCTU for the provision of the DCTU Work. The
> Lessee shall accept the Port's utilization of the DCTU Employees
> with respect to the provision of the DCTU Work and shall, in
> accordance with Section 3.23(d), accept work performed by the
> DCTU Employees at such time as the Lessee determines that such
> work complies with the provisions of this Agreement (including
> the Operating Standards) and applicable law. The Port shall have
> responsibility for the conduct of the DCTU Employees in
> performing the DCTU Work.

*Id.*

The lease defines the District Council of Trade Unions' ("DCTU") work by referring to the DCTU-Port collective bargaining agreement. *Id.* The DCTU-Port CBA defines the work broadly as the work the DCTU has "historically and consistently" performed, generally consisting of facilities maintenance. SMF at ¶ 6. The International Brotherhood of Electrical Workers, Local 48 ("IBEW, Local 48") is one of the unions comprising the DCTU and represents certain workers employed by the Port of Portland. *Id.* The DCTU-Port CBA further provides that the terms and conditions of employment are governed by Oregon's public-sector employment laws. Section 2.03 of that CBA provides for dues checkoff procedures under ORS 292.055 and 243.776, as well as Section 17 retirement benefits from "[t]he Oregon Public Employees Retirement System (PERS) and/or the Oregon Public Service Retirement Plan (OPSRP)." SMF at ¶ 7.

D.    ICTSI's Admission To PMA

Days after the lease was approved, ICTSI submitted an application to join PMA. Amidon Dec., Ex. G. In response to a question on the application about whether "ICTSI or any affiliate

8

[was] bound to any labor agreement(s)," ICTSI circled "No."  *Id.*  Soon thereafter, PMA

accepted ICTSI's application on June 16, 2010.  Amidon Dec., ¶ 14.  Pursuant to Section 1.82 of

the PCLCD, ICTSI became bound to the coastwise agreement.  *Id.* at ¶ 15, Ex. H.

     E.    ICTSI's Use Of The ILWU Employees Under The PCLCD

ICTSI took over operations at Terminal 6 at the Port of Portland on February 12, 2011.

SMF at ¶ 8.  ICTSI employed ILWU labor under the PCLCD and contracted directly with the

shipping lines to handle their containers, including reefers.  *Id.*  Although the Port of Portland

was no longer operating Terminal 6, the Port of Portland's public employees continued to

perform certain M&R work on the reefers.  *Id.*

Because of ICTSI's obligations under the PCLCD, the ILWU pursued contractual

grievances over the disputed reefer work on the dock.  SMF at ¶ 9.  On May 23, 2012, the ILWU

and PMA convened a meeting of the Coast Labor Relations Committee ("CLRC"), the highest

decision-making labor-management committee under the coastwise collective bargaining

agreement.  *Id.*  Their decisions bind PMA and every member employer pursuant to Section 1.76

of the PCLCD.  *Id.*  The CLRC ruled that the M&R work belonged to the ILWU and ordered

ICTSI to assign the work to the ILWU and, under Section 1.76, to defend the ILWU's right to

perform the work.  *Id.*

     F.    The NLRB Section 10(k) Proceeding

The NLRA makes it unlawful for any "labor organization" to coerce or threaten any

"person" with the object of:

> forcing or requiring any ***employer*** to assign particular work to ***employees*** in a
> particular labor organization or in a particular trade, craft, or class rather than to
> ***employees*** in another labor organization or in another trade, craft, or class, unless
> such employer is failing to conform to an order or certification of the Board
> determining the bargaining representative for employees performing such work.

29 U.S.C. § 158(b)(4)(D) (emphases added).  Congress passed this provision in 1947 as part of the Labor Management Relations Act amendments to the NLRA.[3]  Section 8(b)(4)(D) was designed to have the Board resolve certain work jurisdiction disputes involving two groups of statutory "employees" when a statutory "employer" under the Act is caught in the middle of a jurisdictional turf war between the two "employee" groups.  *See, e.g.*, *NLRB v. Radio & Television Broad. Eng'rs Union, Local 121*, 364 U.S. 573, 576-77, 580-81 (1961) ("CBS").

When an employer is subject to a threat or coercion related to a covered jurisdictional dispute, it may file an unfair labor practice charge with the Board.  Rather than proceed directly to an unfair labor practice trial, Congress established a novel procedure, under Section 10(k) of the Act[4], whereby the Board decides whether "reasonable cause" exists for a violation of Section 8(b)(4)(D), issues a notice of hearing, and after the hearing grants the work to one of the "employee" groups.  Generally, the Board affords great weight to the employer's preference on which group of "employees" should receive the work.  *See, e.g.*, *Dist. No. 15, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 326 NLRB 62, 67 (1998).  Should the employees not awarded the work comply with the Section 10(k) award, the Section 8(b)(4)(D) charge is dismissed.  If the losing "employee" group continues to demand the work through unlawful means, the Board will proceed with a Section 8(b)(4)(D) adjudication.

---

[3] 29 U.S.C. §§ 141 *et seq.*, 61 Stat. 136 (1947) (also called the "Taft-Hartley Act").

[4] The proceeding is called a "10(k) Proceeding" after the section of the NLRA providing the procedural mechanism for the NLRA to decide jurisdictional disputes between two groups of statutory employees under Section 8(b)(4)(D). 29 U.S.C. § 160(k).  In its entirety Section 10(k) provides:

> Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute.  Upon compliance by the parties with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

It is undisputed that "[b]efore the Board may proceed with determining a dispute pursuant to Section 10(k) of the Act, there must be reasonable cause to believe that Section 8(b)(4)(D) has been violated."  August 13 Decision at 3.

### 1.    The Section 8(b)(4)(D) Charge Filed by ICTSI

Shortly before the ILWU's grievances were scheduled for arbitration, on May 9, 2012, PMA informed ICTSI that the ILWU was extremely likely to prevail with its claims and reviewed ICTSI's obligations under Section 1.76.  At the conclusion of the conversation, ICTSI's counsel announced that he intended to contact counsel for IBEW, Local 48, which represents the Port of Portland's employees involved in the work dispute.  SMF at ¶ 10.  On May 10, 2012, just weeks before the ILWU's grievances were scheduled for arbitration, counsel for the IBEW, Local 48, sent a letter to ICTSI's counsel threatening to picket if ICTSI assigned the work to the ILWU.  SMF at ¶ 11.  PMA-member ICTSI, without the support of PMA, filed a charge with the NLRB on May 10, 2012, alleging that the IBEW, Local 48 violated Section 8(b)(4)(D) of the NLRA by engaging in proscribed activity with an object of forcing ICTSI to assign certain work to public employees of the Port of Portland, represented by the IBEW, rather than to ICTSI's employees represented by the ILWU.  SMF at ¶ 12.

### 2.    The 10(k) Hearing

On May 24, the day after the CLRC met and ruled that the work should be assigned to the ILWU, the NLRB's hearing under Section 10(k) commenced in Portland in response to ICTSI's unfair labor practice charge against the IBEW, Local 48.  SMF at ¶ 13.  The ILWU intervened to protect its bargained-for right to perform the work.  SMF at ¶ 12.  In the proceedings, ICTSI did not abide by its obligations under the PCLCD and argue that the work should be assigned to the ILWU.  Instead, ICTSI emphasized its lease agreement with the Port, offered extensive testimony from Port managers about the Port's assignment of the work to the public employees represented by the IBEW, and argued that the lease deprives ICTSI of authority to assign the work at all.  SMF at ¶ 16.  Indeed, ICTSI expressly urged to the NLRB that it preferred the work be awarded to the public employees represented by the IBEW, Local 48.  *Id.*

      3.      <u>The NLRB's Regional Director Denies PMA's Motion To Intervene</u>

On May 21, 2012, three days before the NLRB's Section 10(k) hearing began, PMA filed a written motion to intervene in the NLRB proceedings.  SMF at ¶ 14.  PMA contended that it was entitled to intervene based on its status as an interested party, given that the case involved a PMA-member, ICTSI, as well as the collective bargaining agreement with the ILWU administered by PMA.  *Id.*  The NLRB had previously permitted PMA to intervene in numerous previous work assignment disputes involving PMA members and ILWU-PMA collective bargaining agreements.  *Id.*  On May 24, 2012, the first day of hearing, the NLRB's Regional Director, in Seattle, Washington, denied PMA's motion to intervene.   SMF at ¶ 15.

      4.      <u>The PMA Files A Request For Permission To Appeal To The Board</u>

On June 12, 2012, PMA filed a written request for special permission to appeal the Regional Director's denial of PMA's intervention motion.  SMF at ¶ 17.  In its request, PMA explained that "if [it] had been allowed to participate, it would have established that the Port of Portland, a governmental agency that is not an employer under the Act, is the employer of the IBEW-represented employees seeking jurisdiction over the disputed work" and that there could be no jurisdictional dispute within the meaning of Section 8(b)(4)(D) of the Act because there were not two groups of statutory "employees."  *Id.*  PMA emphasized that "ICTSI could not represent PMA's interests because they have opposing views on which employees should perform the work at issue" and "the ILWU cannot represent PMA's interests in this case because they are collective bargaining adversaries with highly dissimilar interests and members with competing goals."  *Id.*  PMA's brief also substantively argued that "Section 8(b)(4)(D), by its plain terms, can be violated only where a labor organization tries to force an employer to assign work to one group of employees over another group of employees.  This means, of course, that the dispute must be between two groups of 'employees' under the [NLRA]."  *Id.*

5.    The Board's August 13, 2012 10(k) Decision

On August 13, 2012, the Board issued a decision awarding the disputed work to the Port of Portland's public employees represented by the IBEW, Local 48.  *See IBEW, Local 48*, 358 NLRB No. 102 (Aug. 13, 2012) (the "August 13 Decision").  Throughout its decision, the Board repeatedly states as undisputed fact that the IBEW-represented employees seeking the work at issue were employees of the Port of Portland, a state governmental entity.  SMF at ¶ 18.  For example, the Board stated that the "IBEW-represented employees *employed by the Port* have performed this work since terminal 6 operations began in 1974."  358 NLRB No. 102, slip op. 1 (emphasis added).  The Board further confirmed "that certain work [] had for many years been performed by Port employees pursuant to the Port's labor agreement with the DCTU."  *Id.*  And once more, the Board reiterated that "the record evidence shows the work in dispute is performed by IBEW-represented Port employees pursuant to the terms of the DCTU."  *Id.* at 4.

In a footnote, the Board summarily dispensed with PMA's motion to intervene, stating that "PMA's request is denied inasmuch as the record and briefs herein adequately present the issues before the Board and the positions of the parties."  *Id.* at 2 n.4; SMF at ¶ 19.  Although the Board frankly acknowledged that "the dispute concerns the assignment of work by public employer Port to its own employees, *who are excluded from coverage by the Act*," *id.* at 3 (emphasis added), the Board did not directly address the statutory requirement that there must be two groups of statutory employees before the Board has jurisdiction to render a 10(k) decision. Rather, the Board simply explained that:

> Although ICTSI does not directly employ the employees who are performing the disputed work, Section 8(b)(4)(D) is applicable because in a 10(k) case, the Board need have jurisdiction *only over the employer that is the target of a respondent union's unlawful conduct.*

*Id.* at 3 (emphasis added).  This point of statutory jurisdiction to consider a case is true, but ultimately irrelevant to the other elements of Section 8(b)(4)(D).  At no point in the decision did the Board analyze the statutory argument PMA presented in its motion to intervene, namely that Section 8(b)(4)(D) only grants the Board jurisdiction to issue a Section 10(k) award where the two groups of "employees" vying for the work at issue are "employees" as expressly defined by the NLRA.

6.    <u>PMA's Motion For Reconsideration</u>

On August 20, 2012, PMA filed a motion for reconsideration with respect to the Board's August 13, 2012 Decision.  SMF at ¶ 20.  The motion argued that "[t]he employees awarded the work, represented by the IBEW, Local 48, are employees of a public-sector entity, the Port of Portland.  They are not statutory employees within the meaning of 29 U.S.C. § 152(3)."  *Id.*  The motion continued by citing clear statutory language to show that "Section 8(b)(4)(D) is only invoked where two groups of statutory employees, as defined by Section 2(3) of the Act, are seeking the same work."  *Id.*

PMA's motion also produced new evidence to show PMA's status as an interested party in the dispute entitled it to status as an Intervenor.  SMF at ¶ 21.  As PMA explained to the Board, "[j]ust two days after the Section 10(k) decision, PMA and its member companies received simultaneous demand letters from ICTSI, the Port of Portland, and the ILWU."  *Id.*  The letters threatened "a whole host of legal claims against PMA" should PMA not side with each party's respective interpretation on the legal issues involved in the Section 10(k) decision as well as other related litigation.  *Id.*  On August 29, 2012, the NLRB summarily, and again without explanation, denied PMA's motion for reconsideration, thereby exhausting any possible avenue for administrative review available to PMA as related to PMA's independent interests.  SMF at ¶ 22.

14

G.      Proceedings By the Board Against the ILWU

At present, PMA understands the NLRB to be actively prosecuting a Section 8(b)(4)(D)

charge against the ILWU, premised on the underlying Section 10(k) decision issued on August

13, 2012.  SMF at ¶ 23.[5]  PMA did not receive any notice from the NLRB regarding this Section

8(b)(4)(D) trial.  *Id.*[6]

III.    **ARGUMENT**

A.      Summary Judgment Standard

Summary judgment is appropriate "if the movant shows [through facts supported in the

record] that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  This procedural device is not a "disfavored procedural shortcut" but a reasoned

and careful way to resolve cases fairly and expeditiously.  *Celotex Corp. v. Catrett*, 477 U.S.

317, 327 (1986).  In determining whether a genuine issue of material fact exists, the Court must

view all facts and reasonable inferences in the light most favorable to the non-moving party.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27

F.3d 635, 638 (D.C. Cir. 1994).

---

[5] The Board's Memorandum of Points and Authorities in Support of its Motion to Transfer confirms that the Board is prosecuting a Section 8(b)(4)(D) charge against the ILWU.  Dkt. No. 12-1, at p. 8.  The NLRB also confirmed that is has initiated two distinct cases in the District of Oregon, based on Section 10(l) of the NLRA, which grants the Board authority to obtain preliminary injunctive relief in federal court while it adjudicates certain unfair labor practice charges against labor organizations.  *Hooks v. Int'l Longshore and Warehouse Union*, 3:12-cv-01088-SI (D. Or.); *Hooks v. Int'l Longshore and Warehouse Union*, 3:12-cv-01691-SI (D. Or.).  Id. at p. 2, n.3.  Only the second action, filed on September 19, 2012, cites the Board's August 13 Decision.  PMA is not a party to either Section 10(l) action.

[6] On June 13, 2012, PMA and the ILWU filed suit against ICTSI in the U.S. District Court for the District of Oregon, under Section 301 of the Labor Management Relations Act, to enforce the May 23 decision of the CLRC that the disputed work belonged to the ILWU.  *Int'l Longshoremen & Warehouse Union & Pac. Maritime Ass'n. v. ICTSI Oregon, Inc.*, Case No. 3:12-cv-01058-SI (D. Or.) (filed June 13, 2012); SMF at ¶ 24.  In light of the NLRB's *ultra vires* 10(k) decision on August 13, in *IBEW, Local 48*, 358 NLRB No. 102 (2012), PMA cannot pursue this action because, notwithstanding that 10(k) decisions are not "final orders" under the NLRA, "the section 10(k) award trumps the collective bargaining agreement" and "take[s] precedence" over other contractual obligations.  *See, e.g., Int'l Longshoremen's & Warehousemen's Union v. NLRB*, 884 F.2d 1407, 1413 (D.C. Cir. 1989) ("Sea-Land").

B.      The NLRB Lacked Authority To Issue A Section 10(k) Decision Because There
        Were Not Two Competing Groups of Statutory "Employees"

The NLRB lacked authority to issue the August 13 Decision.  Section 8(b)(4)(D) grants

the Board jurisdiction to intervene in work assignment disputes only where two groups of

NLRA-covered "employees" are seeking the same work.  The Board conceded, as it must, that

one of the two groups of employees involved here were public-sector employees of the Port of

Portland, a state governmental employer, and thus are not "employees" as defined by the NLRA.

Accordingly, as discussed herein, this Court should find the Board's August 13 Decision null and

void.

1.      The Express Text Of Section 8(b)(4)(D) And Section 10(k) Provide The
        NLRB Jurisdiction Only Where Two Groups of NLRA-Covered
        Employees Seek The Same Work

A statute's precise language matters.  "[W]hen a statute speaks with clarity to an issue,

judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is

finished."  *Metro. Stevedore Co. v. Rambo*, 515 U.S. 291, 295 (1995) (citation omitted); *see also,

e.g.*, *Butler v. DOJ*, 492 F.3d 440, 443 (D.C. Cir. 2007) ("In construing a statute, the court

begins with the plain language of the statute." (citation omitted)).   "[I]n interpreting a statute a

court should always turn first to one, cardinal canon before all others . . . .  [C]ourts must

presume that a legislature says in a statute what it means and means in a statute what it says."

*Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992); *see also, e.g.*, *BedRoc Ltd. v. United

States*, 541 U.S. 176, 183 (2004) (quoting *Conn. Nat'l Bank*, 503 U.S. at 253-54).

Turning to the NLRA itself, the language of Section 8(b)(4)(D) unambiguously requires

two competing groups of statutory "employees" before the NLRB has jurisdiction to render a

decision under Section 10(k).  The statute provides that a "labor organization" violates the

8(b)(4)(D) by:

16

> [F]orcing or requiring any employer to assign particular work *to employees* in a particular labor organization or in a particular trade, craft, or class rather than *to employees* in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.

29 U.S.C. § 158(b)(4)(D) (emphases added).  Thus, for the NLRB to have jurisdiction under Section 8(b)(4)(D) at least three things must be present:  (1) there must be a covered "labor organization" that is capable of violating Section 8(b)(4)(D);[7] (2) there must be at least one "employer" that is subject to the unlawful conduct;[8] and (3) there must be at least two groups of statutory "employees," whether or not represented by a particular labor organization, seeking the same work.  It is this third jurisdictional element that is wholly lacking in this case.[9]

The NLRA, as a basic matter, limits the statutory definition of "employee" to most private-sector employees, to the exclusion of employees employed by public-sector

---

[7] There is no dispute that the IBEW, Local 48 is a covered labor organization.  *See* August 13 Decision at 1.

[8] There is no dispute that ICTSI is a statutory "employer" and covered by the NLRA.  *See* August 13 Decision at 1.

[9] As mentioned above, Section 10(k) of the Act is the procedural mechanism adopted by Congress for the Board to resolve disputes as related to Section 8(b)(4)(D).  As the Supreme Court has explained:

> The language of § 10(k), supplementing § 8(b)(4)(D) as it does, sets up a method adopted by Congress to try to get jurisdictional disputes settled. The words 'hear and determine the dispute' convey not only the idea of hearing but also the idea of deciding a controversy. And the clause *'the dispute out of which such unfair labor practice shall have arisen' can have no other meaning except a jurisdictional dispute under § 8(b)(4)(D) which is a dispute between two or more groups of employees* over which is entitled to do certain work for an employer.

*NLRB v. Radio & Television Broad. Eng'rs Union, Local 121*, 364 U.S. 573, 579 (1961) ("CBS") (emphasis added); *see also, e.g.*, *NLRB v. Plasters' Local Union No. 79*, 404 U.S. 116, 134 (1971) ("the Board has power, under Section 10(k) only to hear and determine the merits *of a jurisdictional dispute*" (emphasis added)).  Thus, key to the determination of whether the Board may insert itself into a dispute over work assignments is whether "the dispute is between two employee groups."  *Int'l Longshoremen's & Warehousemen's Union, Local 62-B v. NLRB*, 781 F.2d 919, 923 (D.C. Cir. 1986) ("Alaska Timber").  "The question whether a jurisdictional dispute existed is a preliminary one, and can not be ignored.  *Id.* at 926.  When the Board finds "reasonable cause to believe that Section 8(b)(4)(D) has been violated," it then proceeds with a Section 10(k) hearing and decides which group of "employees" is entitled to the work.  August 13 Decision at 3.

entities, whether at the federal, state, or local level.  Specifically, Section 2(3) of the Act

defines the term "employee" to exclude all those employed by entities not considered an

"employer" under Section 2(2).

> Congress defined "employee" in the NLRA as follows:
>
> The term "employee" shall include any employee, and shall not be limited to the
> employees of a particular employer, unless this subchapter explicitly states
> otherwise, and shall include any individual whose work has ceased as a
> consequence of, or in connection with, any current labor dispute or because of any
> unfair labor practice, and who has not obtained any other regular and substantially
> equivalent employment, *but shall not include any individual employed* as an
> agricultural laborer, or in the domestic service of any family or person at his
> home, or any individual employed by his parent or spouse, or any individual
> having the status of an independent contractor, or any individual employed as a
> supervisor, or any individual employed by an employer subject to the Railway
> Labor Act [45 U.S.C. 151 et seq.], as amended from time to time, or *by any other*
> *person who is not an employer as herein defined.*

29 U.S.C. § 152(3) (emphases added).  Section 2(2), in turn, specifically provides that

"the term 'employer'. . . *shall **not** include . . . any State or political subdivision thereof.*"

29 U.S.C. § 152(2) (emphasis added).  As the Board itself has succinctly explained, "[t]o

be a statutory employee under the NLRA, one must be employed by a statutory

employer."  *Children's Hosp. of Mich.*, 299 NLRB 430, 432 (1990).

Here, the IBEW-represented employees of the Port of Portland are plainly not NLRA

statutory employees because they are employed by the Port, a political subdivision of the State.

As noted above, the Board's August 13 Decision repeatedly confirms this basic fact.  358 NLRB

No. 102, slip op. 1, 4; *see supra* at 13.  And it is beyond dispute that the Port of Portland – the

entity that the Board decision repeatedly states is the employer of the IBEW-represented

employees awarded the work – is a subdivision of the State of Oregon and not an NLRA-covered

employer.  *See, e.g.*, *Hale v. Port of Portland,* 783 P.2d 506, 518 (1989) ("[T]he Port [of

Portland] is an instrumentality of the state government, performing state functions."); Or. Rev.

Stat. §§ 778.010, 174.116(2)(hh), 198.605 (Port was created as a public agency by the Oregon

Legislature).  The Port's website further states that the Oregon Legislature created the Port in

1891 as a regional government and that the Port's commissioners are appointed by the Governor

and confirmed by the State Senate.  *See*

*http://www.portofportland.com/PDFPOP/Newsroom_Corporate_Fact_Sheet.pdf* (last visited

Oct. 16, 2012).  Because public sector employees are not statutory employees under the NLRA,

there were not two groups of "employees" under 8(b)(4)(D).

> As the D.C. Circuit has held in reasoning equally applicable to this case:

> The best evidence of the scope of authority is found not in the
> statutory language spelling out the process for executing that
> authority but instead in the language establishing the authority.
> ***Where, as here, that language unambiguously uses a statutorily
> defined term, that definition controls the scope of authority***.

*Wolverine Power Co. v. FERC*, 963 F.2d 446, 451 (D.C. Cir. 1992) (emphasis added).  Under the

plain language of the NLRA, the Board lacked jurisdiction to render a decision and grant work to

public-sector employees.  This court should set aside the decision and enjoin the NLRB from

taking any further action based on its *ultra vires* decision.

> 2.      The Legislative History Of Section 8(b)(4)(D) And Section 10(k) Supports
>          The Plain Language Interpretation As Well

Because the NLRA unambiguously requires two groups of statutory "employees" before

the NLRB can render a decision in a jurisdictional dispute, a court's "inquiry begins with the

statutory text, and ends there as well [since] the text is unambiguous." *BedRoc*, 541 U.S. at 183

(citing *Lamie v. U.S. Tr.,* 540 U.S. 526, 534 (2004); *Hartford Underwriters Ins. Co. v. Union*

*Planters Bank, N. A.,* 530 U.S. 1, 6 (2000); *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438

(1999); and *Connecticut Nat'l Bank*, 503 U.S. at 254)); *see also, e.g.*, *United States v.*

*Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004) ("As an initial matter, the Supreme Court

reiterated as recently as this past Term that resort to legislative history is not appropriate in construing plain statutory language."); *Kay v. Fed. Commc'ns Comm'n*, 525 F.3d 1277, 1279 (D.C. Cir. 2008) ("[C]ourts have no authority to rewrite the plain text of a statute.").  However, even if the Court were to examine the legislative history, it confirms what the statute makes plain – Section 8(b)(4)(D) and Section 10(k) apply only where there is a jurisdictional dispute between two groups of statutory "employees."

"Congress enacted these [Section 10(k)] provisions to allow for the peaceful resolution of competing claims between rival groups of *employee[s]*."  *Int'l Longshoremen's & Warehousemen's Union, Local 62-B v. NLRB*, 781 F.2d 919, 923 (D.C. Cir. 1986) ("Alaska Timber") (emphasis added).  When Congress in 1947 first considered and debated what is now Sections 8(b)(4)(D) and 10(k), the proposed language did not require the dispute to be between two groups of statutory "employees."  Instead, Senate Bill S. 1126, introduced on March 24, 1947, proposed the following language for Section 8(b)(4)(D):

> forcing or requiring any employer to assign to *members* of a particular labor organization work tasks assigned by an employer to *members* of some other labor organization . . . .

S. 1126, 80th Cong., 1st Session, p. 113 (emphases added).

If that language had been adopted, the Board in the instant matter may actually have had jurisdiction because the IBEW is a covered "labor organization" under the NLRA, given that it has private-sector members elsewhere in the country, and that "members" of this organization would have sought work at the same time "members" of the ILWU sought the same work.  *But Congress did not pass this language into law.*  In fact, Senator Taft, a lead sponsor of what would become the final Labor Management Relations Act of 1947, was criticized for adding the "employee" term to Section 8(b)(4)(D) as opposed to retaining the original "members of a

particular labor organization" standard.  Senator Murray argued on the record that the use of the term "employee" by the conference committee would insert the Board in jurisdictional disputes between unionized employees and non-union groups of employees, and thus afford employers a legal path to shift work to non-union employees through Section 8(b)(4)(D) and 10(k).  Cong. Record, Senate, June 6, 1947 at 1579.  Congress, however, decided to keep the amended language in the final bill that became law, and thus the statute required competing groups of "employees."  This provision has remained unchanged for over 65 years.

An attempt was made in 1949 to amend Section 8(b)(4)(D) to have it apply to "disputes between two or more labor organizations" and emphasized that "[t]he disputant groups need not be 'employees' of the same or of any employer."  S. 249, Hearings Jan. 31, Feb. 1, 2, 3, 1949, p. 25.  This effort also failed and the statutory term "employees" was not altered or removed.

In sum, although the Court need not and should not resort to legislative history given the plain language of the statute, the legislative history of Section 8(b)(4)(D) and Section 10(k) confirm what the statute makes clear – there must be two competing groups of statutory "employees" before the Board has authority to resolve a jurisdictional dispute.

3.      NLRB Precedent Also Supports The Plain Language Of Section 8(b)(4)(D)

PMA is aware of no NLRB or federal court precedent that affords the agency the power to read out statutory language from Section 8(b)(4)(D) or convert the plain meaning of the provision to include work disputes involving a group of non-"employees" under the Act.  To the contrary, prior to the August 13 Decision, the Board itself had a history of fidelity to the precise language of Section 8(b)(4) and other related provisions.

For example, the Board used a plain language interpretation of Section 8(b)(4)(D) in *Local 236, International Brotherhood of Teamsters*, 194 NLRB 594 (1971), when it quashed a notice of Section 10(k) hearing because there were not two groups of "employees" under the statute.  That case involved a work dispute between a group of statutory "employees," someone the Board found to be an "independent contractor," and a "supervisor" under the NLRA.  Because the NLRA defines independent contractors and supervisors to fall outside the definition of "employee" under Section 2(3), there could be no dispute "between competing groups of employees over an employer's work assignment" and thus "no dispute exists within the meaning of Section 10(k) of the Act."  194 NLRB at 594.

The Board likewise has not ignored the distinct statutory terms used and defined by Congress in the context of cases involving the application of Section 8(b)(4)(D) to public-sector employers, as well as other non-employers or non-employees under the Act.  In a decision involving Local 3 of the International Brotherhood of Electrical Workers, the Board held the term "any employer" within Section 8(b)(4)(D) does not include public-sector entities, in that case the Board of Education of the City of New York, and thus a Section 10(k) hearing could not lawfully proceed:

> The Board of Education is an agency of the State of New York and, as a governmental entity, it is statutorily excluded from the definition of employers over which this Board may assert jurisdiction under Section 2(2) of the Act.  While it is true that a governmental entity, such as the Board of Education, is considered a person within the meaning of Section 8(b)(4) of the Act, it has not and cannot be held to be an employer for any purpose under the Act due to the restriction in Section 2(2).

*Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 219 NLRB 528, 530 (1975).  Given that the threats and coercion by the IBEW, Local 3 targeted the Board of Education, there was no basis to

find a violation of Section 8(b)(4)(D) as targeted against "any employer" under the NLRA. *Id.* The Board therefore quashed the notice of hearing for the Section 10(k) proceeding. *Id.*[10]

Similarly, the Board issued a decision analyzing the language of Section 8(e) and 8(b)(4)(A) of the Act and concluded that Congress meant what it said when carefully using the statutory term "employer" versus the broader term "person." *Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 244 NLRB 357 (1979). In *Local 3, IBEW*, the Board was confronted with an unfair labor practice charge that alleged an agreement between NLRA-covered employers and the Facilities Development Corporation (FDC), a facility and instrumentality of the State of New York, violated Section 8(e) of the NLRA. *Id.* at 357. Rejecting this charge based on a plain statutory language analysis, the Board reasoned as follows:

> The literal language of Section 8(e) clearly limits its application to agreements between statutory labor organization and employers, for it states, in relevant part, that:
>
> (e) It shall be an unfair labor practice for any *labor organization* and any *employer* to enter into any contract or agreement ... whereby such employer ceases or refrains or agrees to cease or refrain from ... dealing in any of the products of any other employer, or to cease doing business with any other *person* .... [Emphasis supplied.]
>
> Thus, that section uses the terms "labor organization," "employer," and "person," which are defined in Section 2(5), (2), and (1), respectively. If Section 8(e) is construed in accord with these definitions, it limits the finding of an unfair labor practice to agreements between "labor organizations" and "employers." There is no mention of agreements between "labor organizations" and "persons." Indeed, the term "person" is mentioned solely in connection with the object of the agreement obtained from an "employer." Thus, a construction which makes the terms "employer" and "person" interchangeable runs contrary to the express language of Section 8(e), as well as to the definitional scheme of the Act, for if "employer" is construed to include "person," then the last phrase "or to cease doing business with any other person" essentially is surplusage.

---

[10] The Board also reiterated in *Local 3, IBEW* what numerous courts have made plain: "Before the Board may proceed to a determination of dispute under Section 10(k) of the Act, it must be satisfied that there is reasonable cause to believe that Section 8(b)(4)(D) has been violated." 219 NLRB at 529; *see also, e.g., Int'l Longshoremen's & Warehousemen's Union, Local 14, AFL-CIO v. NLRB*, 85 F.3d 646, 651 (D.C. Cir. 1996) (citing "reasonable cause" standard for proceeding with Section 10(k) hearing).

*Id.* at 357 (emphasis added).

4.      Nothing In The Board's August 13 Decision Saves The Board's *Ultra Vires* Action

As shown above, the Board cannot issue a Section 10(k) award unless there are two groups of NLRA-covered "employees" seeking the same work.  Consequently, the Board clearly acted without authority and in derogation of the NLRA by resolving the jurisdictional dispute between (i) the ILWU-represented employees of ICTSI under PMA's multi-employer agreement and (ii) the IBEW-represented employees of the public employer Port of Portland.

In its August 13 Decision, the Board did not address this issue directly.  Rather, the Board stated only that "Section 8(b)(4)(D) is applicable because in a 10(k) case, the Board need have jurisdiction **only** *over the employer that is the target of a respondent union's unlawful conduct*."  *Id.* at 3 (emphasis added).  As discussed above, however, a statutory "employer" is only one of the required prerequisites in the NLRA for the Board to have jurisdiction to resolve a jurisdictional dispute.  *See supra* at 17.  It is thus a necessary, but not sufficient, condition for the Board to acquire jurisdiction.

Nowhere in the August 13 Decision does the Board even purport to address why two groups of statutory "employees" are not required.  Rather, the Board cited two of its earlier decisions for its proposition that it only need have jurisdiction over a statutory employer for Section 8(b)(4)(D) to be applicable.  *See* August 13 Decision at 3 (citing *Plumbers Local 195 (Gulf Oil)*, 275 NLRB 484 (1985) and *Int'l Longshoremen Ass'n, Local 1911 (Cargo Handlers)*, 236 NLRB 1439 (1978)).  These two decisions, however, which could not in any event re-write a statute, do not support the Board's proposition.

Instead, these two decisions involved an examination of the "any employer" element necessary to invoke 10(k) jurisdiction in Section 8(b)(4)(D), not the "employees" vs.

"employees" element.  Indeed, in both cases cited by the Board, there was no dispute that there were two groups of statutory employees vying for the work – the statutory "employees" then performing the work and the unionized statutory "employees" seeking the work.  The unique aspect of the cases cited by the Board was that the statutory "employer" who was the object of the labor action was not the employer of the employees performing the work and did not control the assignment of the work in question.  Applying the clear language Congress used, the Board held in those cases that the congressional phrase "any employer" demonstrates the "clear intent of Congress to protect not only employers whose work is in dispute from such strike activity, but *any* employer against whom a union acts with such a purpose."  *Gulf Oil*, 275 NLRB at 485 (quoting *Cargo Handlers*, 236 NLRB at 1440).

Simply put, neither of the cases cited by the Board involved the issue presented here.  Moreover, far from supporting the Board's efforts to read terms out of the statute or redefine them, the decisions confirm the Board's prior fidelity to the language of Section 8(b)(4)(D).  In order to assert jurisdiction in both *Gulf Oil* and *Cargo Handlers*, the NLRB took refuge in the precise language of Section 8(b)(4)(D) and concluded that the broad phrase "any employer" precluded the Board from limiting application of Section 8(b)(4)(D) to cases where the targeted employer actually controlled or directly performed the work at issue.  *Gulf Oil*, 275 NLRB at 485; *Cargo Handlers*, 236 NLRB at 1440.  If the Board had applied the same fidelity to the statutory text in its August 13 Decision, it would have concluded that it lacked the ability to render a decision absent two groups of statutory "employees."

In sum, the Board acted outside the bounds of the NLRA in the August 13 Decision.  The language of Section 8(b)(4)(D) is clear and not susceptible to an alternative interpretation that would read out the defined term "employees" from the text or provide a definition different than

that expressly provided by Congress.  Accordingly, the Court should find the Board's decision in *IBEW, Local 48 ultra vires* and void.

C.    *Leedom v. Kyne* Provides This Court Jurisdiction To Reverse The Board's *Ultra Vires* Action

Given the NLRB's plain derogation of the statute, its failure to permit PMA to intervene in the proceedings, and its failure to directly address PMA's substantive arguments, PMA anticipates that the Board will take the position that the NLRB's *ultra vires* action escapes review based on the fact that Section 10(e) and (f) of the NLRA does not provide this Court jurisdiction to review Section 10(k) decisions.  This contention, if made, would be plainly meritless.

Section 10(e) and (f) grants the federal courts of appeal specific jurisdiction to review "final orders" of the Board in unfair labor practice adjudications.  29 U.S.C. § 160(e) and (f).  Section 10(k) awards are not considered such "final orders" ordinarily subject to appeal and review by the federal courts of appeal, and thus disputes over the Section 10(k) award generally become enveloped by the Section 8(b)(4)(D) unfair labor practice adjudication that may follow the Board's assignment of work.  *See, e.g., Alaska Timber*, 781 F.2d at 923 ("Section 10(k) orders are not immediately reviewable.").[11]

In 1958, however, in *Leedom v. Kyne*, 358 U.S. 184 (1958), the U.S. Supreme Court established an express exception for challenges to federal agency action, including NLRB action, even though the statutory scheme usually does not provide for court review.  In *Leedom*, a union challenged an NLRB determination that a bargaining unit including both professional and

---

[11] Even though Section 10(k) decisions are not "final orders" under the NLRA, the federal courts, including the Supreme Court, have recognized that "the section 10(k) award trumps the collective bargaining agreement" and would "take precedence" over other contractual obligations.  *See Int'l Longshoremen's & Warehousemen's Union v. NLRB*, 884 F.2d 1407, 1413 (D.C. Cir. 1989) ("Sea-Land") (citing *Carey v. Westinghouse Corp.*, 375 U.S. 261 (1964)).

26

nonprofessional employees was appropriate under the NLRA – despite a clear provision in the NLRA mandating that professional employees first be afforded an opportunity to vote separately on whether they are to be included in a unit with nonprofessional employees.  *Id.* at 185-86; *see* 29 U.S.C. § 159(b)(1).  While the Supreme Court understood that an NLRB order in a representation certification proceeding was not a "final order" and therefore "not subject to judicial review except as it may be drawn in question by a petition for . . . review of an order . . . restraining an unfair labor practice," the Court nevertheless held that the district court had jurisdiction over the union's challenge.  *Id.* at 187.  *Leedom* emphasized that without the district court's jurisdiction, it would "wholly deprive the union of a meaningful and adequate means of vindicating its statutory rights" as the union members had "no other means, within their control" of obtaining judicial review.  *Id.* at 190; *see also, e.g.*, *Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (interpreting *Leedom* exception and elements).

The D.C. Circuit has outlined the test for jurisdiction under *Leedom* as follows:  (1) "the agency has acted 'in excess of its delegated powers and contrary to a specific prohibition' which is 'clear and mandatory'" and (2) "barring review by the district court 'would wholly deprive [the party] of a meaningful and adequate means of vindicating its statutory rights'" within its control.  *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006) (citing *Leedom*, 358 U.S. at 188 and *MCorp Fin.*, 502 U.S. at 43); *see also, e.g.*, *Sturm, Ruger & Co. v. Chao*, 300 F.3d 867, 874 (D.C. Cir. 2002); *Rwy. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 661-62 (D.C. Cir. 1994) ("RLEA").

Further, in cases involving international commerce to and from the United States, the Supreme Court has exercised a distinct-type of *Leedom v. Kyne* jurisdiction to block NLRB action that threatens the stable operation of foreign trade with the United States.  *McCulloch v.*

*Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10 (1963) ("Honduras").  In *Honduras*, the NLRB sought to extend its jurisdictional reach to maritime crews of vessels owned by foreign subsidiaries of American corporations.  Finding "substantial United States contacts, outweighing the numerous foreign contacts present," the Board held that the vessels were sufficiently engaged in "commerce" under Section 2(6) of the NLRA, thus meeting the statutory threshold to order a representation election under Section 9(c)(1).  *Id.* at 14-15.

Although, as in the instant case, the ruling at issue in *Honduras* was not subject to challenge and was not immediately reviewable except indirectly following an unfair labor practice determination, the Supreme Court nevertheless determined that the district court had jurisdiction to address the issue.  Before reversing the NLRB's attempt to expand its authority, the Supreme Court first determined that it had jurisdiction, even though "the Board has violated no specific prohibition in the Act," because "the Board's assertion of power to determine the representation of foreign seamen aboard vessels under foreign flags has aroused vigorous protests from foreign governments and created international problems for our Government."  *Id.* at 16-17.  The Court found the "international complexion" of the dispute to provide "compelling justification" for the judiciary to stop the Board's expansion of its jurisdiction.  The Court thus held that the case "falls within the limited exception fashioned in *Leedom*."  *Id.* at 16.

Likewise, in the present case, the NLRB has sought to expand its jurisdiction to work disputes impacting international commerce by serving as a referee between public-sector and private-sector employees.  Rather than leave the parties to resolve the dispute under the applicable collective bargaining agreements and contractual documents, the Board decided to step in and greatly complicate the matter – resulting in a destabilizing impact on PMA and its members' West Coast operations, and foreign commerce to and from the United States.

28

*Honduras* thus provides further support for this Court to return the NLRB to its statutory limits under Section 8(b)(4)(D).

        1.     <u>Violation Of Clear Statutory Mandate In Section 8(b)(4)(D)</u>

As for the specific *Leedom* test outlined by D.C. Circuit precedent, the first element, violation of a clear statutory mandate, is plainly met here.  As discussed in detail in Section III.B, *supra* at 16-19, Section 8(b)(4)(D) requires two competing groups of statutory "employees."  By exercising jurisdiction here, the Board violated a "clear and mandatory" provision and its *ultra vires* action should be remedied under the rationale of *Leedom*.

While *Leedom* jurisdiction is oft cited as an "extraordinary" remedy, the federal courts have exercised it when faced with agency action outside the bounds of a statute.  For instance, the D.C. Circuit has confronted action by the National Mediation Board ("NMB"), the sister agency of the NLRB that governs labor relations for air and rail carriers operating in the United States, that was found to violate a "clear and mandatory" provision of the Railway Labor Act ("RLA").  *RLEA*, 29 F.3d at 665.  The district court in *RLEA* had earlier dismissed a challenge filed by a group of labor unions to the NMB's new merger procedures, finding that the presumption against "review" in such agency cases should be followed.  *Id.* at 660.  The D.C. Circuit disagreed.  Through *Leedom v. Kyne* jurisdiction, the court held that the NMB's newly-established merger procedures, which allowed a carrier to file a representation application, impermissibly read out language from Section 2, Ninth of the RLA.  Section 2, Ninth distinguished "parties" in representation disputes from "carriers," as made clear by a simple review of the statutory language.  *Id.* at 665.  By affording carriers then the ability to file representation applications as "parties," the new rules conflicted with clear and mandatory statutory language under the RLA.

Because the NLRB's decision in *IBEW, Local 48* ignores a clear provision of the statute, this Court has jurisdiction to rein in the agency.

    2.    PMA Has No Other Means Within Its Control to Have This *Ultra Vires* Agency Action Reviewed

This action also falls comfortably within the second prong of *Leedom* jurisdiction.  As noted above, Section 10(k) decisions may be subject to future review indirectly in subsequent review of a Section 8(b)(4)(D) decision by a federal court of appeals under Section 10(e) or 10(f) of the NLRA.  Simply relying on this potential for future review in general, however, reads out a key component of the second *Leedom* element – not whether the action may possibly be subject to review in the future, but whether the party asserting *Leedom* jurisdiction has any possible means *within its control* to have the *ultra vires* action checked by the federal courts.

In fact, in *Leedom* itself, the Court's decision relied on the fact that the union had no legal means to ensure that an unfair labor practice adjudication would follow and/or that it would have the ability or means to challenge the underlying failure to have professional employees vote for their inclusion or exclusion in the unit.  358 U.S. at 190.  Only the employer was in control of that litigation path, as only the employer could reject bargaining with the union, trigger a Section 8(a)(5) unfair labor practice violation against the employer for failing to bargain with a certified union, and then having the underlying professional employee issue reviewed by the Board or a federal court of appeals.

The same rationale applies here.  PMA has no other means within its control to check the Board's assertion of extra-statutory powers.  Only the ILWU, the party that is now presumed to have violated Section 8(b)(4)(D) in litigation with the Board, controls the unfair labor practice adjudication.  PMA is not a party to this adjudication, which based on PMA's best knowledge remains pending.  Without *Leedom* jurisdiction in this case, PMA effectively will be denied a

path within its control to correct the Board's mistaken assertion of power in a work assignment dispute between public-sector employees and private-sector statutory "employees."

Absent the Court's involvement, PMA will continue to be subject to conflicting legal demands, from ICTSI, the Port of Portland, and the ILWU.  SMF ¶ 21.  *Leedom* jurisdiction was established for a case just like this – where the NLRB's exercise of extra-statutory cannot be challenged by any other means within the plaintiff's control.

## IV.    Conclusion

This is a case about a federal agency staying within the bounds of the federal statute that gives it the power to act in only specific circumstances.  The NLRB's August 13 Decision issued despite the undisputed absence of two groups of statutory "employees" competing for the same work.  Because this jurisdictional prerequisite for the Board to issue a Section 10(k) decision was not met, the August 13 Decision is *ultra vires*.  Moreover, this Court has the authority to remedy the Board's error based on *Leedom v. Kyne* and its progeny, as the NLRB violated a clear statutory provision, and PMA has no other means within its control to correct the violation. Therefore, PMA's motion for summary judgment should be granted, the August 13 Decision should be declared null and void, the Board should be enjoined from taking any action based on the decision, and the Court should grant PMA such other relief as the Court deems appropriate.

Dated:  October 16, 2012

Respectfully submitted,

/s/ Howard M. Radzely
MORGAN, LEWIS & BOCKIUS LLP
Howard M. Radzely (D.C. Bar #437957)
Charles I. Cohen (D.C. Bar #284893)
David R. Broderdorf (D.C. Bar #984847)
1111 Pennsylvania Avenue, NW
Washington, D.C.  20004

(202) 739-5996

Counsel for PACIFIC MARITIME
ASSOCIATION